**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**LAD SERVICES OF LOUISIANA, LLC**                    CIVIL ACTION

**VERSUS**                                                                      NO. 24-2446

**DRAGADOS/HAWAIIAN DREDGING//**                SECTION: D (2)
**ORION JOINT VENTURE, ET AL.**

## ORDER AND REASONS

Before the Court is Defendant Dragados/Hawaiian Dredging/Orion, Joint Venture's ("DHO") Motion to Dismiss or, in the alternative, Motion to Transfer Venue.[1] Plaintiff LAD Services of Louisiana, LLC ("LAD") has filed an Opposition,[2] and DHO has filed a Reply.[3]

Also before the Court is a Renewed Motion to Defer Ruling on Defendant's Motion to Dismiss Pending Completion of Jurisdiction, filed by LAD.[4] DHO opposes the Motion,[5] and LAD has filed a Reply.[6]

After careful consideration of the parties' memoranda, the record, and the applicable law, the Court **GRANTS** the Motion to Dismiss, **DENIES** the Motion to Defer Ruling, and **TRANSFERS** this matter to the United States District Court for the District of Hawaii.

---

[1] R. Doc. 83.
[2] R. Doc. 85.
[3] R. Doc. 93
[4] R. Doc. 84.
[5] R. Doc. 87.
[6] R. Doc. 91.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an alleged contractual dispute concerning the replacement of Dry Dock No. 3 at Joint Base Pearl Harbor-Hickam in Hawaii ("Dry Dock No. 3").[7] Plaintiff LAD is a Louisiana limited liability company that specializes in dry dock fabrication, new barge fabrication, structural fabrication, dock side repair, and marine salvage.[8] Lee Dragna ("Dragna"), the sole member of LAD, serves as LAD's president and owner.[9] Defendant DHO is a general partnership organized in Hawaii that routinely bids on shipyard infrastructure work provided by the Naval Facilities Engineering Systems Command Pacific.[10]

DHO was awarded with a $2.8 billion contract from the United States Navy for the construction and replacement of Dry Dock No. 3 with Dry Dock No. 5 at Joint Base Pearl Harbor-Hickam.[11] According to DHO:

> The scope at issue concerned two primary elements of work. First, DHO was in need of subcontractor support to transport Precast Floor Units ("PFU"), each made of concrete and weighing approximately 4,600 tons, from the Project's staging area on the Waipio Peninsula within Pearl Harbor to a waiting floating dry dock. The Project's staging area on the Waipio Peninsula is situated across the Pearl Harbor channel from the Dry Dock No. 3 site. Since the Waipio Peninsula staging area sits across the Pearl Harbor channel from the Dry Dock No. 3 site, DHO also needed subcontractor support to transport the PFUs over the water in the harbor to the Dry Dock No. 3 site. Once the PFUs were floated in the proximity of the Dry Dock No. 3 site via the floating dry dock, the PFUs were to be maneuvered into place within the dry dock site and carefully lowered down to the seabed utilizing a gantry crane and ballast system. When lowered into place, the PFUs constitute the "basement" of the newly constructed, permanent dry dock. Thus, DHO needed a single

---

[7] R. Doc. 80. The Court takes the Factual Background from the Fourth Amended Complaint which is the operative Complaint in the matter.

[8] *Id.* at p. 5.

[9] *Id.*

[10] *Id.* at pp. 2–3, 5.

[11] *Id.*

subcontractor or multiple subcontractors that could perform this specialized work.[12]

Due to the complexities associated with the scope of work, DHO contacted multiple subcontractors, including LAD, to inquire about the contractors' ability to perform the specialized work.[13]

On February 8, 2023, Dwain Sanders ("Sanders"), the Marine Project Manager for DHO, called Lee Babin ("Babin") of Babin Marine, LLC[14] regarding the specialized work in conjunction with the replacement of Dry Dock No. 3.[15] Sanders sent Babin a follow-up email that same morning to memorialize his inquiry.[16] Babin responded by inquiring about the duration of the project.[17] Sanders conveyed that the project would range from "2024 to 2026" in duration and that "[w]e can do a rental or a purchase with a buy back all options are open."[18]

The next day, on February 9, 2023, Babin forwarded the previous email chain between Babin and Sanders to Dragna at LAD.[19] Sanders then directly emailed Dragna at LAD, copying Pietro Cerveglieri ("Cerveglieri") of LCI Precon,[20] on

---

[12] R. Doc. 83-1 at pp. 3–4.

[13] *Id.* at p. 4.

[14] Babin Marine is a marine construction and charter company located in Morgan City, Louisiana. R. Doc. 85 at p. 6.

[15] R. Doc. 85 at p. 6.

[16] *Id.* (citing R. Doc. 32-1). Sanders' email stated that "[i]t was a pleasure speaking with you this morning. We are looking for a 300*100*20 flat deck barge that can be outfitted to be used as a semi-submersible with-in the Hickam Naval Base. The unit will need to [sic] USA flagged as well. The units we are casting are +/-72'*115' 2 each per cycle @ +/-12,000 tons each. Based on our in-hose [sic] engineering we may need to add additional blasting tanks to the corners that can be removable during construction than [sic] re-attached for controlled sinking[.] Look forward to seeing what we can produce." R. Doc. 32-1.

[17] R. Doc. 85 at p. 6 (citing R. Doc. 32-1 at p. 3).

[18] *Id.* (citing R. Doc. 32-1 at p. 4.).

[19] *Id.* (citing R. Doc. 32-1 at p. 4).

[20] Although Plaintiff suggests that Pietro Cerveglieri is employed by DHO, the record reflects that Cerveglieri's email address is associated with LCI Precon. *Compare* R. Doc. 85 at p. 6, *with* R. Doc. 32-1 at p. 6. LCI Precon is an Italian based company that offers a wide range of preconstruction services

February 13, 2023 about the replacement of Dry Dock No. 3.[21] In the February 13, 2023 email to Dragna, Sanders corrected the weight specifications for the PFUs, confirmed their dimensions, and inquired whether LAD had the ability to construct a dry dock that could handle two units simultaneously and whether such units could be built on land and subsequently skidded onto the dry dock.[22]

The next day, Cerveglieri forwarded three-dimensional isometric drawings[23] of the PFUs to Sanders, who then forwarded such drawings to Dragna and Babin.[24] Sanders emailed Dragna and Babin that "'[w]e need to cast 9 of these units.'"[25] The following day, on February 15, 2023, Sanders emailed Dragna, in pertinent part, as follows:

> We had a meeting yesterday to go over different options on how to best construct and deliver the concrete units. Can you give us a rough drawing and estimate to build us a unit that has the capability to construct two units at a time. I need to run this past the executive committee. It looks very promising using the dry dock method vs. retrofit a flat deck barge with ballast tanks and pumps.[26]

Thereafter, Sanders followed up with Dragna via email on February 21, 2023, stating that "[w]e need a drawing showing the outside and interior of the vessel so we can see how the segments will fit including the ballast tank layout and height. Also I need

---

in North America, including but not limited to design management, construction and logistic plans, and four-dimensional modeling. *See* Fed. R. Evid. 201.

[21] R. Doc. 85 at p. 6 (citing R. Doc. 32-1 at p. 5).

[22] *Id.* (citing R. Doc. 32-1 at p. 5).

[23] R. Doc. 32-1 at p. 8.

[24] R. Doc. 85 at p. 6 (citing R. Doc. 32-1 at p. 6).

[25] *Id.* (quoting R. Doc. 32-1 at p. 7).

[26] R. Doc. 32-1 at p. 9; *see* R. Doc. 85 at pp. 6–7(citing R. Doc. 32-1 at p. 9).

cost, by back terms, operation of the vessel in Hawaii and build schedule for the executive committee."[27]

On March 8, 2023, Rachael Smith ("Smith"), LAD's Controller, sent a quote to Sanders via email.[28] In response, on March 10, 2023, Sanders sent by email:

> Can we set up a conference call next week to go over cost associated with additional engineering drawings and calculations. Our inhouse engineers would like to gain a better understanding of your dry dock. One main concern is to maintain the floor above water level during the construction or do we use this vessel for taking the segments from land to water (elevator) . . . .[29]

A Microsoft Teams meeting for the purpose of discussing "the dry dock configuration and methods to launch the segments" was scheduled for March 14, 2023 with Dragna, Babin, Cerveglieri, Sanders, and various other DHO employees.[30] Dragna, however, was unable to attend the meeting due to an illness.[31]

On March 20, 2023, Sanders sent the following email to Dragna: "Any information from your drafting engineer for the dry dock? Can you send me your contact for [Self Propelled Modular Transporters] we would like to reach out to them. Is this something that might interest you on a buy back . . . ."[32] Eight days later, on March 28, 2023, Smith sent an email to Sanders, providing as follows:

Please see attached the Floating Drydock Proposal.

Lee was able to get some pricing daily rental for the following barges:

250' x 72' x 16' - $2,000 / day
260' x 100' x 16' - $4,000 / day

---

[27] R. Doc. 32-1 at p. 10; *see* R. Doc. 85 at p. 7 (citing R. Doc. 32-1 at p. 10).
[28] R. Doc. 85 at p. 7 (citing R. Doc. 32-2 at p. 2).
[29] R. Doc. 32-2 at p. 3; *see* R. Doc. 85 at p. 7 (citing R. Doc. 32-2 at p. 3).
[30] R. Doc. 85 at p. 7 (citing R. Doc. 32-2 at p. 7).
[31] R. Doc. 32-2 at p. 9.
[32] R. Doc. 85 at pp. 7–8 (citing R. Doc. 32-2 at p. 10).

> The availability of these barges is limited and the 250' will not be available until October. It is suggested to secure these barges as soon as possible to ensure they are available.[33]

Also on March 28, 2023, Sanders sent the following email in response to Smith's email:

> Can you tell us what the cost would be to get us the following information within two weeks. We need this information for our in-house technical team to get approval for the construction of the dry dock. As I back [sic] into our schedule we have two options we are still exploring. The first is to construct two floor segments on the dry dock at a time this option will require the dry dock to be in Hawaii by mid February 2024. The second is to construct the floor segments on land and use the dry dock as a "elevator" to move the units from land to sea which gives us addition [sic] time for delivery of the dry dock. Time is of the essence for us to finalize our approach, any assistance will be greatly appreciated.[34]

Sanders' March 28, 2023 email also contained a "20-item technical specifications list covering length, external beam, internal beam, depth of pontoon, height of lateral walls,, deck point load, maximum load, uniform deck cargo loading, various draft configurations, loaded stability, submerged maximum draft, mooring systems, ballasting systems and lowering speed, power systems, sailing limitations, anchor requirements, and corrosion protection."[35]

Two days later, on March 30, 2023, Sanders sent the following email to Smith and Dragna:

> Will you be sending today the new proposal Lee and I spoke about Tuesday? Cost to get us the engineering requirements within the next two weeks for our in-house technical teams to review so we can issue

---

[33] R. Doc. 32-2 at p. 12; *see* R. Doc. 85 at p. 8 (citing R. Doc. 32-2 at p. 12).
[34] R. Doc. 32-2 at p. 13; *see* R. Doc. 85 at p. 8 (citing R. Doc. 32-2 at p. 13).
[35] R. Doc. 85 at p. 8 (citing R. Doc. 32-2 at pp. 13–14).

6

LAD a PO to supply the dry dock by February 2024[.] If you have any questions please reach out to me. I will be available after 9 am pst[.][36]

Less than an hour later, Smith sent a proposal to Sanders via email.[37] Sanders, in response, stated via email "'[m]any thanks for getting this out please change the PO to Dragados Hawaiian Dredge Orion JV or use DHO JV[.]'"[38]

Negotiations continued. Thereafter, through emails, telephone conversations, and Microsoft Teams meetings, it was discovered that DHO miscalculated the weight restrictions associated with Dry Dock No. 3.[39] Cerveglieri requested that LAD submit a redesign to ensure that the dry dock could withstand greater amounts of weight.[40] In May 2023, Dragna spoke on the phone with Sanders regarding the re-engineering, in which Dragna expressed his concern about the amount of time and resources LAD was investing into this project and was reassured by Sanders, who stated "don't worry, you're our guy and you're going to do this job[.]"[41] LAD eventually completed the re-engineering design.[42] DHO then requested a quote DHO from LAD, to which LAD submitted a quote to DHO.[43] Subsequently, DHO requested a payment schedule, and LAD submitted such payment schedule to DHO.[44]

On October 11, 2023, Manuel Morejon ("Morejon"), a Construction Manager at DHO, sent the following email to Dragna and Smith: "[p]lease see attached Draft of

---

[36] R. Doc. 32-2 at p. 15; *see* R. Doc. 85 at p. 8 (citing R. Doc. 32-2 at p. 15).
[37] R. Doc. 85 at p. 8 (citing R. Doc. 32-2 at p. 16).
[38] *Id.* (quoting R. Doc. 32-2 at p. 17).
[39] R. Doc. 80 at p. 7.
[40] *Id.*
[41] *Id.*
[42] *Id.* at p. 8.
[43] *Id.*
[44] *Id.*

Purchase Order for your review. We can set up a video call to discuss if needed. Let me know."[45] This Purchase Order (the "First Purchase Order") set forth various terms and conditions related to the replacement of Dry Dock No. 3.[46] After reviewing the First Purchase Order, Plaintiff LAD transmitted a second version of the Purchase Order (the "Second Purchase Order") via email on November 2, 2023, stating "[p]lease see attached draft of Purchase Order for your review."[47]

Among other things, the Second Purchase Order provides a forum selection clause, payment conditions, temporal obligation conditions, and surety bond provisions.[48] The Second Purchase Order states that "[a]ny claims or causes of action arising out of or in connection with this Purchase Order shall be commenced in a court of competent jurisdiction located in the State where the Project is located."[49] The "Project" is defined as "FY23 MCON P-209 Dry Dock 3 Replacement[;] MACC N62742-22-D-1311[;] RFP N62742-2F2-R-1315[;] [and] Task Order N627 4223F4007[.]"[50] Regarding payment conditions, the Second Purchase Order sets forth that:

> Retention of this Purchase Order for ten (10) days or shipment or invoicing by Seller shall constitute acceptance of all terms and conditions of this Purchase Order. Invoices will not be processed unless each invoice (1) is in quadruplicate; (2) refers to the above Job and Purchase Order numbers; (3) a signed copy of this Purchase Order is returned; and (4) is accompanied by signed delivery receipts. Where

---

[45] R. Doc. 62-1 at p. 2; *see* R. Doc. 83-1 at p. 15 (citing R. Doc. 62-1 at p. 2).
[46] R. Doc. 83-1 at p. 15 (citing R. Doc. 62-1).
[47] R. Doc. 54-1 at p. 2.; *see* R. Doc. 83-1 at p. 15 (citing R. Doc. 54-1).
[48] In the First Purchase Order, "Seller" refers to LAD and "Purchaser" refers to DHO. R. Doc. 32-4 at p. 2. In the Second Purchase Order, however, "Supplier" refers to LAD and "Purchaser" refers to DHO. R. Doc. 54-1 at p. 3.
[49] R. Doc. 54-1 at p. 8.
[50] *Id.*

applicable, an insurance certificate satisfactory to Purchaser must be received and accepted prior to processing of invoices.[51]

The Second Purchase Order also imposes temporal obligations, in which it specifically provides that:

> Seller shall immediately begin Work to insure [sic] that delivery of the Products shall be made in accordance with the requirement of the Schedule. Time is of the essence in the Seller's delivery of the Products under this Purchase Order, and it is essential that the Products and services be provided to Purchaser in a manner and in accordance with the Schedule so as to permit Purchaser to complete construction of the Project in the fastest and most efficient manner possible.[52]

Additionally, the Second Purchase Order provides conditions about a surety bond:

> Purchaser may, at Purchaser's sole discretion and expense, require that Seller obtain and furnish a surety bond guaranteeing full performance of this Purchase Order and that Seller will promptly and fully pay for all work, labor and materials and other charges or costs in connection with the Products[.] The form of the Bond, the amount of the Bond, and surety underwriting the Bond shall be acceptable to Purchaser in its sole discretion.[53]

Located in Schedule One to the Second Purchase Order, the document provides that "Seller shall furnish a surety bond as required by the Purchase Order. Bond rate is [TBD]% and will be paid by Purchaser as a direct pass-through cost. Said bond cost is not included in the above-referenced Price."[54]

After Plaintiff LAD sent the Second Purchase Order, LAD took several courses of actions. First, LAD secured a $14,000,000 bond through a New Orleans based

---

[51] *Id.* at p. 5.
[52] *Id.*
[53] *Id.* at p. 9.
[54] *Id.* at p. 10.

9

company.[55] Second, LAD corresponded with its contact in the Panama Canal to make an expedited passage arrangement for the dry dock.[56]

On December 7, 2023, DHO's Morejon sent LAD an email stating "thank you for working with us but we can not come to terms and will not be moving forward."[57] Similarly, on December 8, 2023, another DHO employee, in an email to LAD, provided that "at this stage we can not come to terms . . . ."[58]

LAD filed suit in the Eastern District of Louisiana on September 20, 2024.[59] On September 3, 2025, the Court held a hearing on DHO's previous Motion to Dismiss or, in the alternative, Motion to Transfer Venue.[60] Nearly two months later, on November 18, 2025, DHO filed an Unopposed Motion for Leave to Submit Additional Exhibit to its Reply to LAD's Opposition to DHO's previous Motion to Dismiss or, in the alternative, Motion to Transfer Venue.[61] In the Motion for Leave, DHO explained that discovery revealed the existence of the Second Purchase Order that was revised by LAD and thereafter sent to DHO during the negotiations.[62] DHO sought leave to add the Second Purchase Order as an exhibit to its previous Reply memorandum.[63] In its Motion for Leave, DHO details the discovery of the Second Purchase Order

---

[55] R. Doc. 80 at p. 8 (citing R. Doc. 32-3 at 5).
[56] Schedule 1 to the Second Purchase Order provides that "LAD will provide a 350' x 150' x 12' ABS Classed Drydock designed to complete the project. The drydock will be towed from Seller's facility in Amelia, Louisiana through the Panama Canal to Pearl Harbor, Honolulu, Hawaii. Seller will provide the labor to operate the Drydock for 60 days to complete the job. Upon completion the Drydock will be towed back to Amelia, Louisiana. Seller will provide a six-man crew for 60 days in Hawaii." R. Doc. 62-4 at 9.
[57] R. Doc. 80 at p. 8.
[58] *Id.* at p. 9.
[59] R. Doc. 1.
[60] R. Doc. 41.
[61] R. Doc. 54.
[62] *Id.*
[63] *Id.* at p. 2; R. Doc. 54-1.

which occurred after the Court held oral argument on DHO's pending original Motion to Dismiss.[64] The Court granted DHO's Motion for Leave[65] and subsequently ordered supplemental briefing addressing any impact the Second Purchase Order may have on the Court's personal jurisdiction analysis in this matter.[66] Both parties filed supplemental briefing.[67]

LAD filed a Fourth Amended Complaint on December 31, 2025.[68] LAD alleges breach of contract, bad faith breach of contract, deceptive trade practices, detrimental reliance, unjust enrichment, and misappropriation of trade secrets.[69] On February 4, 2026, DHO filed the instant Motion to Dismiss, or in the alternative, Motion to Transfer Venue.[70] LAD, in turn, filed the instant Renewed Motion to Defer Ruling on Defendant's Motion to Dismiss Pending Completion of Jurisdiction on February 11, 2026.[71]

### A. DHO's Motion to Dismiss, or in the alternative, Motion to Transfer Venue

DHO argues that the Court should dismiss the entire matter pursuant to Fed. R. Civ. P. 12(b)(2) for lack of specific personal jurisdiction over DHO.[72] Specifically,

---

[64] *See* R. Doc. 54, *DHO's Motion for Leave to Submit Additional Exhibit to Defendant's Reply to Plaintiff's Opposition to Motion to Dismiss or, in the Alternative, Motion to Transfer Venue* (referencing R. Doc. 29, *DHO's original Motion to Dismiss*).

[65] R. Doc. 56.

[66] R. Doc. 57.

[67] R. Docs. 60 and 62.

[68] R. Doc. 80. In light of the Fourth Amended Complaint, the Court also denied as moot DHO's pending Motion to Dismiss. *See* R. Docs. 29 and 81.

[69] R. Doc. 80 at pp. 9–16.

[70] R. Doc. 83.

[71] R. Doc. 84.

[72] R. Doc. 83. DHO also argues that LAD's misappropriation of trade secrets claim must be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Id.* The Court need not address DHO's Rule 12(b)(6) arguments because, as explained in the instant Order and Reasons, this Court does not have personal jurisdiction over DHO and transfers this matter to the District of Hawaii.

DHO asserts that personal jurisdiction is improper because it has no minimum contacts to Louisiana, LAD incorrectly uses its own ties to establish personal jurisdiction, and subjecting DHO to litigation in Louisiana would offend the traditional notions of fair play and substantial justice.[73] DHO makes the alternative argument that, should the Court find personal jurisdiction exists, the Court should transfer this matter to the United States District Court for the District of Hawaii.[74] DHO specifically maintains that all the 28 U.S.C. § 1404(a) private and public interest factors weigh in favor of transferring this matter to Hawaii.[75] Beyond the § 1404(a) factors, DHO points to the forum selection clause in the Second Purchase Order, which DHO contends that such clause mandates that any suit must be brought in Hawaii.[76]

LAD opposes the Motion.[77] LAD asserts that the Court may properly exercise specific personal jurisdiction over DHO.[78] LAD maintains that DHO availed itself to multiple business contacts within the state of Louisiana, thereby creating a reasonable expectation that DHO may be hailed into this Court.[79] Additionally, LAD contends that its claims arise directly out of DHO's contacts with Louisiana.[80] Further, LAD contends that the exercise of specific personal jurisdiction over DHO is fair and reasonable.[81]    Thus, according to LAD, specific personal jurisdiction is

---

[73] R. Doc. 83-1 at pp. 12–17.
[74] *Id.* at p. 17.
[75] *Id.* at p. 18.
[76] *Id.* at p. 19-20.
[77] R. Doc. 85.
[78] *Id.* at 1–2.
[79] *Id.* at pp. 5–11.
[80] *Id.* at p. 11.
[81] *Id.* at pp. 14–17.

proper.[82] LAD also maintains that in the event the Court finds that it lacks personal jurisdiction over the DHO, the Court should allow for jurisdictional discovery or leave for LAD to amend its complaint.[83] Lastly, LAD opposes the Motion to Transfer Venue and asserts that all the private and public interest factors weigh against transfer.[84] In its Reply memorandum, DHO reiterates that LAD cannot establish specific personal jurisdiction, objects to LAD's request for jurisdictional discovery, and re-urges its arguments that the private and public interest factors favor transfer.[85]

### B. LAD's Renewed Motion to Defer Ruling on Defendant's Motion to Dismiss Pending Completion of Jurisdiction Discovery

LAD filed the instant Motion to Defer Ruling on DHO's Motion to Dismiss Pending Completion of Jurisdictional Discovery on February 11, 2026.[86] LAD asserts that this Court has broad discretion in deferring jurisdictional rulings pending the completion of discovery.[87] LAD argues that the Court, using such broad discretion, should defer ruling on DHO's Motion to Dismiss for lack of personal jurisdiction until LAD has had the opportunity to engage in jurisdictional discovery.[88] In support, LAD asserts that it should be allowed to develop jurisdictional facts, that it requires additional time to review DHO's voluminous document production prior to the Court's ruling on jurisdiction, and that DHO's failure to make its witnesses available prevents LAD from developing jurisdictional facts.[89] According to LAD, any court

---

[82] *Id.* at p. 17.
[83] *Id.*
[84] *Id.*
[85] R. Doc. 93.
[86] R. Doc. 84.
[87] *Id.*
[88] *Id.*
[89] *Id.* at pp. 3–5.

13

ruling prior to its completion of jurisdictional discovery would constitute reversible error.[90] Thus, LAD argues that its Motion to Defer should be granted.[91]

DHO opposes LAD's Motion to Defer, arguing that "[a]ny request to delay a ruling on the Motion to Dismiss/Transfer through the conclusion of fact discovery in this litigation is groundless and is simply a needless delay resulting in additional time and costs being incurred as the result of this matter."[92] As explained by DHO:

> DHO filed its initial motion seeking to dismiss based on a lack of personal jurisdiction back in April 2025. LAD has been provided with almost a year to plead a sufficient basis to establish specific personal jurisdiction. Despite this extensive period of time, LAD still has not provided any ties between DHO and the State of Louisiana. Instead, LAD continues in its attempt to shift responsibility to DHO to establish jurisdiction through LAD's baseless allegations concerning fact discovery. The ongoing assertion that LAD needs DHO to provide the bases of personal jurisdiction is groundless. The inability of LAD to satisfy its obligation is reflected in the Declaration from LAD's principal, Mr. Lee Dragna, in support of its separate Opposition to DHO's Motion to Dismiss/Transfer, providing unsupported statements regarding alleged second or third-tier subcontractor and suppliers that may or may not have furnished labor or materials to the underlying project.[93]

Thus, according to DHO, LAD's Motion to Defer Ruling on DHO's Motion to Dismiss should be denied.[94]

In Reply, LAD asserts that DHO misinterprets LAD's *prima facie* burden of demonstrating personal jurisdiction, DHO misapplies Fifth Circuit precedent, jurisdictional depositions are necessary to allow LAD to establish a *prima facie*

---

[90] *Id.* at p. 6.
[91] *Id.* at pp. 6–7.
[92] R. Doc. 87 at p. 6.
[93] *Id.* at pp. 8–9 (citations removed).
[94] *Id.* at p. 13.

burden of personal jurisdiction, and that a balance of equitable factors favors the Court granting its Motion to Defer.[95]

## II.    LEGAL STANDARD

### A. Personal Jurisdiction

"Personal jurisdiction, [like subject matter jurisdiction], is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'"[96]    Because personal jurisdiction is a "threshold ground[] for denying audience to a case on the merits," a court must usually address the threshold personal jurisdiction claim before reaching a claim on the merits.[97] When a nonresident defendant, like DHO, moves to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the burden of establishing jurisdiction belongs to the plaintiff.[98]

"On a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true."[99] Further, any factual conflicts are resolved in favor of Plaintiff.[100] However, in determining whether the plaintiffs have presented a prima facie case of personal jurisdiction, a court "will not 'credit

---

[95] R. Doc. 91 at pp. 1–8.
[96] *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (second alteration in original) (quoting *Emps. Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937)).
[97] *Id.* at 584–85; *accord Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 232 (5th Cir. 2012).
[98] *Hebert v. Wing Sale, Inc.*, 337 F. Supp. 3d 714, 717 (E.D. La. 2018) (citing *Luv N' Care v. Insta-Mix, Inc.*, 438 F. 3d 465, 469 (5th Cir. 2006)).
[99] *Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 495 (5th Cir. 2022)(citation modified).
[100] *Halliburton Energy Services, Incorporated v. Ironshore Specialty Insurance Company*, 921 F.3d 522, 539 (5th Cir. 2019).

conclusory allegations, even if uncontroverted.'"[101] "In considering a motion to dismiss for lack of personal jurisdiction a district court may consider affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."[102]

If the Court does not hold an evidentiary hearing, a plaintiff need only establish a *prima facie* case of personal jurisdiction.[103] But when a district court holds an evidentiary hearing on personal jurisdiction, however, a plaintiff must establish personal jurisdiction by a preponderance of the evidence.[104] Given that the Court did not hold an evidentiary hearing on September 3, 2025,[105] LAD need only make a *prima facie* case of personal jurisdiction.[106]

---

[101] *Sealed Appellant 1 v. Sealed Appellee 1*, 625 Fed.Appx. 628, 631 (5th Cir. 2015)(quoting *Panda Brandywine Corp. v. Potomac Elec. Power Co.,* 253 F.3d 865, 869 (5th Cir. 2001)).

[102] *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002)(citation modified).

[103] *Conn Appliances, Incorporated v. Williams*, 936 F.3d 345, 347 (5th Cir. 2019).

[104] *In re Chinese-Manufactured Drywall Products Liability Litigation*, 753 F.3d 521, 529 (5th Cir. 2014).

[105] R. Doc. 41.

[106] "The distinguishing factor between a mere hearing and an 'evidentiary hearing' is the presentation of evidence 'beyond the written materials.'" *In re Chinese Manufactured Drywall Products Liability Litigation*, 894 F.Supp. 2d 819, 836 (E.D. La. Sept. 4, 2012)(Fallon, J.). The Fifth Circuit has determined that an evidentiary hearing occurs when "the court invite[s] the parties to present evidence supporting their positions." *Bonner v. Triple–S Management Corporation*, 661 Fed. Appx. 820, 822 (5th Cir. 2016); *see also Felch* v. *Transportes Lar–Mex SA DE CV*, 92 F.3d 320, 327 n.17 (5th Cir. 1996)(finding that an evidentiary hearing occurred where the court "opened the door to the presentation of evidence"). In sum, to conduct an evidentiary hearing, "both parties must be allowed to submit affidavits and to employ all forms of discovery, subject to the district court's discretion and as long as the discovery pertains to the personal-jurisdiction issue." *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 242 (5th Cir. 2008). Here, because the Court did not allow the parties to submit additional affidavits beyond the record and employ all forms of discovery, the Court held an ordinary hearing, as opposed to an evidentiary hearing. Accordingly, LAD need only prove a *prima facie* case of personal jurisdiction.

16

## B. Jurisdictional Discovery

It is well-settled that "where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues."[107] "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."[108] "As the party opposing dismissal and requesting discovery, the plaintiffs bear the burden of demonstrating the necessity of discovery."[109] "'If a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts . . . the plaintiff's right to conduct jurisdictional discovery should be sustained.'"[110] However, "[d]iscovery on matters of personal jurisdiction . . . need not be permitted unless the motion to dismiss raises issues of fact . . . .When the lack of personal jurisdiction is clear, discovery would serve no purpose and should not be permitted."[111] As another Section of this Court has explained, "the Fifth Circuit has made clear that 'unlimited jurisdictional discovery is *not* permitted as a matter of course.'"[112] The Fifth Circuit "affirms denials of discovery on questions of personal jurisdiction in cases where the discovery sought 'could not have added any significant

---

[107] *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978).

[108] *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 165 (5th Cir. 1985)(citing *Washington v. Norton Manufacturing Co.,* 588 F.2d 441, 443 (5th Cir. 1979).

[109] *Monkton Ins. Services, Ltd. v. Ritter*, 768 F.3d 429, 434 (5th Cir. 2014)(citation modified).

[110] *Fielding v. Hubert Burda Media, Inc.,* 415 F.3d 419, 429 (5th Cir. 2005)(quoting *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir. 2003)).

[111] *Kelly v. Syria Shell Petroleum Development B.V.*, 213 F.3d 841, 855 (5th Cir. 2000)(citation modified).

[112] *First Inv. Corp. of the Marshall Islands v. Fujian Mawei Shipbuilding, Ltd. of the People's Republic of China*, 858 F.Supp.2d 658, 680–81 (E.D. La. 2012)(Africk, J.)(quoting *Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 849 (5th Cir. 2000)(emphasis original)).

facts.'"[113] Ultimately, the Court has discretion in determining whether jurisdictional discovery is necessary.[114]

### C. Change of Venue

Under 28 U.S.C. § 1406(a), "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."[115] The Fifth Circuit has explained that § 1406(a) "specifically refers to 'laying venue in the wrong division or district,' but a transfer can be made due to the absence of personal jurisdiction in a district where venue is otherwise proper."[116] Accordingly, "'[w]here a court finds that it lacks personal jurisdiction, it . . . is authorized under 28 U.S.C. § 1406(a) to transfer the action.'"[117]

Closely related, 28 U.S.C. § 1631 also governs the transfer of cases.[118] Section 1631 provides, in pertinent part:

> Whenever a civil action is filed in a court as defined in section 610 of this title or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court (or, for cases within the jurisdiction of the United States Tax Court, to that

---

[113] *Wyatt v. Kaplan*, 686 F.2d 276, 284 (5th Cir. 1982)(quoting Washington v. Norton Manufacturing, Inc., 588 F.2d 441, 447 (5th Cir. 1979)).

[114] *Monkton Ins. Services, Ltd.*, 768 F.3d at 434 (citing *Davila v. United States*, 713 F.3d 248, 263–64 (5th Cir. 2013)).

[115] 28 U.S.C. § 1406(a).

[116] *Herman v. Cataphora, Inc.*, 730 F.3d 460, 467 (5th Cir. 2013)(citing *Bentz v. Recile,* 778 F.2d 1026, 1028 (5th Cir. 1985)).

[117] *Franco v. Mabe Trucking Company, Incorporated*, 3 F.4th 788, 795 (5th Cir. 2021)(quoting *Herman*, 730 F.3d at 466).

[118] *See id.* at 794 ("Congress enacted § 1631 as part of the Federal Courts Improvement Act of 1982 . . . . The law appears to be intended to avoid the confusion that was created by §§ 1404(a) and 1406(a)'s focus on whether venue was proper, instead stating that a district court shall transfer the case if there is a lack of jurisdiction and justice so demands regardless of the propriety of the original venue.").

court) in which the action or appeal could have been brought at the time it was filed or noticed . . . .[119]

The Fifth Circuit has addressed the relationship between § 1406(a) and § 1631, explaining as follows:

> That § 1631 and § 1406(a) can function together rather than as alternative avenues for transfer is apparent from the plain text of the two statutes. Both § 1631 and § 1406(a) use the mandatory "shall . . . transfer" language, indicating that they both establish a mandatory duty for a court to transfer a case when their respective requirements are met. When, as in this case, there is both a lack of jurisdiction and a lack of proper venue and the interests of justice weigh in favor of transfer rather than dismissal, the plain language of the statutes indicate that a district court can—indeed, must—satisfy its obligations under both statutes through a single use of the transfer power. It is not an either/or question . . . . Both statutes instruct the court to do the same thing, so there is no reason to choose between the two. A transfer conducted in these circumstances is not solely a § 1406(a) transfer or a § 1631 transfer. It is both.[120]

Accordingly, "[a] case is 'transferable' pursuant to § 1631 when three conditions are met: (1) the transferee court would have been able to exercise its jurisdiction on the date the action was misfiled; (2) the transferor court lacks jurisdiction; and (3) the transfer serves the interest of justice."[121] Ultimately, whether under § 1406(a) or § 1631, a district court has "broad discretion in deciding whether to order a transfer."[122]

---

[119] 28 U.S.C. § 1631.

[120] *Franco*, 3 F.4th at 796 (citation modified).

[121] *Donelon v. Pollick*, Civil Action No. 20-00177-BAJ-RLB, 2021 WL 796145, at *8 (M.D. La. Mar. 2, 2021)(quoting *Harutyunyan v. Love*, Civil Action No. 19-41, 2019 WL 5551901, at *4 (E.D. La. Oct. 28, 2019)(Morgan, J.)).

[122] *In re Volkswagen of America, Inc.*, 545 F.3d 304, 311 (5th Cir. 2008)(citation modified). For the sole sake of convenience, the Court only analyzes whether transfer is appropriate under § 1631. The Court recognizes, however, that "[a] transfer conducted in these circumstances is not solely a § 1406(a) transfer or a § 1631 transfer. It is both." *Franco*, 3 F.4th at 796.

### III.    ANALYSIS

The Court first addresses whether it has specific personal jurisdiction over DHO.[123] The Court then considers LAD's Motion to Defer Ruling on DHO's Motion to Dismiss.[124] Lastly, the Court determines whether transfer of the above-captioned matter to the District of Hawaii is required under § 1631. For the reasons set forth below, the Court finds that it lacks specific personal jurisdiction over DHO, declines to defer its ruling on DHO's Motion to Dismiss, and, in the interest of justice, transfers this matter to the United States District Court for the District of Hawaii pursuant to 28 U.S.C. § 1631.[125]

### A.    The Court does not have specific personal jurisdiction over DHO.

DHO asserts that "LAD, as the plaintiff, has not demonstrated and cannot demonstrate that DHO's activities satisfy the 'minimum contacts' requirement necessary to satisfy (general or) specific personal jurisdiction in Louisiana."[126] In response, LAD argues that because "DHO deliberately 'reached out' to Louisiana, 'specifically and deliberately' negotiated with a Louisiana corporation, and contemplated a contract requiring substantial performance in Louisiana[,]" DHO purposefully availed itself to the privileges and benefits of conducting business in Louisiana.[127] The Court disagrees.

---

[123] R. Doc. 83; *see supra* note 71.
[124] R. Doc. 84.
[125] R. Doc. 29.
[126] R. Doc. 83-1 at p. 15.
[127] R. Doc. 85 at pp. 9–10.

A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant only if two requirements are satisfied: (1) the forum state's long-arm statute must confer personal jurisdiction; and (2) the exercise of jurisdiction must not exceed the boundaries of due process.[128]  Because the limits of Louisiana's long-arm statute are co-extensive with the limits of constitutional due process, the inquiry is simply whether this Court's exercise of jurisdiction over DHO would offend due process.[129]

The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful "contacts, ties, or relations."[130]  As explained by the Supreme Court, "where individuals 'purposefully derive benefit' from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed."[131]   Accordingly, under federal due process requirements, the Court analyzes whether the nonresident defendant, DHO, has certain minimum contacts with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[132]

---

[128] *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006).

[129] *See In re Chinese-Manufactured Drywall Products Liability Litigation*, 753 F.3d 521, 547 (5th Cir. 2014).

[130] *Int'l Shoe Co. v. State of Wash., Off. Of Unemployment Comp. & Placement*, 326 U.S. 310, 319 (1945) (citing authority).

[131] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74 (1985).

[132] *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (quotation and internal quotation marks omitted).

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction.  "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum state."[133]  In contrast, specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation[,]" and requires that "the defendant's suit-related conduct . . . create a substantial connection with the forum State."[134]  As noted by the Supreme Court, "the two forms of jurisdiction address different concerns.  Whereas specific jurisdiction focuses on the relationship between a defendant's challenged conduct and the forum State, general jurisdiction focuses on the defendant's substantial presence in the State irrespective of the location of the challenged conduct."[135] Because DHO is a general partnership organized in Hawaii and the parties do contest the issue of general personal jurisdiction, the Court only analyzes specific personal jurisdiction.[136]

The Fifth Circuit applies a three-step analysis for the specific jurisdiction inquiry, considering:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the

---

[133] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Int'l Shoe*, 326 U.S. at 317).

[134] *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)) (quotation and internal quotation marks omitted) (cleaned up).

[135] *Bauman*, 571 U.S. at 157 n.10 (Sotomayor, J., concurring).

[136] *See Adams v. Unione Mediterranea Di Sicurta*, 220 F.3d 659, 667 (5th Cir. 2000)("[A] a defendant may waive its personal jurisdiction defense, thereby consenting to jurisdiction . . . . Usually a party waives personal jurisdiction by failing to raise the issue when filing a responsive pleading or making a general appearance."); *see also* R. Doc. 83-1 at pp. 11–17 and R. Doc. 85 at pp. 5–18.

> plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.[137]

According to the Fifth Circuit, "[i]f the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable."[138]

For the reasons set forth below, the Court's analysis starts – and ends – with the first prong, as LAD has failed to establish a *prima facie* showing that DHO directed its activities toward Louisiana or purposefully availed itself of the privileges of conducting activities in Louisiana.

### A. Whether the defendant has minimum contacts with the forum state.

As to the "minimum contacts" prong of the analysis, the Supreme Court has held that, "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."[139]  The Supreme Court further explained that, "the relationship must arise out of contacts that the defendant *himself* creates with the forum State."[140] Additionally, "our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."[141] According to the Fifth Circuit, "[a] single act by the defendant directed at the forum state, therefore, can be enough to confer personal jurisdiction if that act gives rise to

---

[137] *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)).
[138] *Seiferth*, 472 F.3d at 271 (citation omitted).
[139] *Walden*, 571 U.S. at 284.
[140] *Id.* (quoting *Burger King Corp.*, 471 U.S. at 475 (emphasis in original)).
[141] *Walden*, 571 U.S. at 285 (citing authority).

the claim being asserted."[142]  The Fifth Circuit has recognized that, "[t]he 'minimum contacts' prong, for specific jurisdiction purposes, is satisfied by actions, or even just a single act, by which the non-resident defendant 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'"[143]  Further, "[t]he non-resident's 'purposeful availment' must be such that the defendant 'should reasonably anticipate being haled into court' in the forum state."[144]

With that said, the Supreme Court has held that merely contracting with a party located in a state does not by itself establish sufficient minimum contacts with that state.[145]  As explained by the Fifth Circuit, "it is now well settled that 'an individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum.'"[146]  The Supreme Court has "emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'"[147]  As such, "[i]t is these factors–prior negotiations and contemplated future consequences, along with the terms of the contract and the

---

[142] *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993) (citing authority).
[143] *Id*. (citing authority).
[144] *Id*. (citing authority).
[145] *See Burger King*, 471 U.S. at 478–79 (citing authority).
[146] *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 222–23 (5th Cir. 2012) (quoting *Burger King*, 471 U.S. at 478) (emphasis in original); *accord Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 544 (5th Cir. 2019) (explaining that a contract alone is not sufficient to constitute minimum contacts).
[147] *Burger King*, 471 U.S. at 479 (quoting *Hoopeston Canning Co. v. Sullen*, 318 U.S. 313, 316–17 (1943)).

parties' actual course of dealing–that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."[148]

DHO does not have sufficient minimum contacts with the state of Louisiana. Again, the Supreme Court has held that merely contracting with a party located in a state does not by itself establish sufficient minimum contacts with that state.[149] Nonetheless, the Court finds that LAD and DHO did not enter into a binding contract under Louisiana law.[150]

    *1. Louisiana law of obligations*

DHO asserts that the preliminary negotiations between itself and LAD do not give rise to the existence of a contract under Louisiana law.[151] In support of their Motion, DHO submits the affidavit of Dwain Sanders, DHO's Marine Project Manager, who attests to the following:

1. I, Dwain Sanders, hereby affirm that I have personal knowledge of the current dispute between  Dragados/Hawaiian Dredging/Orion, Joint Venture ("DHO") and LAD Services of Louisiana, LLC ("LAD"). I also have personal knowledge of the contents of this Declaration.

2. I am currently employed by DHO as the Marine Manager for the replacement of Dry Dock No. 3 at Joint Base Pearl Harbor Hickam, Hawaii (the "Project").

3. I was the Marine Manager for the Project during the relevant period of time for the lawsuit (i.e., 2022-2023)[.]

---

[148] *Id.*

[149] *See id.* at 478–79 (citing authority).

[150] A district court exercising diversity jurisdiction must apply the forum state's substantive law. *See Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009).

[151] R. Doc. 62.

4. I was personally involved in the preliminary discussions between DHO and LAD in 2023, concerning the potential marine dry dock work at the Project.

5. I was physically present in Hawaii during all of my discussions with LAD.

6. I did not travel to Louisiana to meet with LAD at any point in time.

7. During the preliminary discussions between DHO and LAD in 2023, DHO did not direct LAD to perform any work or services that were eventually used on the Project.

8. At no time during my communications with LAD in 2023 did I represent that LAD had been designated for or guaranteed any subcontract for the Project.

9. At no time during my communications with LAD in 2023 did I represent that DHO-awarded any subcontract to LAD for the Project.

10. At no time was LAD directed to mobilize any labor and/or materials at the Project site.

11. At no time in 2023 did DHO issue payment to LAD for any work or services allegedly performed by LAD and relating to the Project.

12. At no time has DHO used any unique or specific design information furnished by LAD during the actual performance of the work on the Project.

13. I am not aware of any proprietary means and methods for marine barge work proposed by LAD that were subsequently transmitted to any other subcontractor for use on the Project.

14. DHO did not enter into any contractual agreement with Crosby Marine Services, Trade Winds Towing, or McDonough Marine Services, in connection with the Project.[152]

Further in support, DHO provides the affidavit of Manuel Morejon, who attests as follows:

---

[152] R. Doc. 83-1 at pp. 23–24.

26

1. I, Manuel Morejon, hereby affirm that I have personal knowledge of the current dispute between Dragados/Hawaiian Dredging/Orion, Joint Venture ("DHO") and LAD Services of Louisiana, LLC ("LAD"). I also have personal knowledge of the contents of this Declaration.

2. I am currently employed by DHO as Deputy Project Manager for the replacement of Dry Dock No. 3 at Joint Base Pearl Harbor Hickam, Hawaii (the "Project").

3. I became personally involved with the Project in August 2023 as Construction Manager.

4. I have not traveled to Louisiana for any purposes relating to the Project.

5. I transmitted DHO's draft purchase order form to LAD via e-mail in October 2023.

6. The purchase order form that l transmitted to LAD for review and comment in October 2023 was a draft of DHO's standard purchase order form for the Project.

7. The cover e-mail that I prepared and sent transmitting the draft purchase order form to LAD for initial review and comment in October 2023, clearly states that the attached purchase order form is a "Draft."

8. The draft purchase order form transmitted to LAD in October 2023 contemplated the work to be performed at the Project site in Hawaii.

9. The draft purchase order form transmitted to LAD was done for the purpose of continuing discussions.

10. The draft purchase order form transmitted to LAD in October 2023 was never intended or represented to be a final proposal or agreement between DHO and LAD.

11. In addition to e-mail communications, it was verbally discussed with LAD representatives that the draft purchase order form transmitted in October 2023 was an initial draft.

12. I do not have unilateral authority to enter into subcontract agreements for the Project. Moreover, I never represented that I held

authority to unilaterally enter into subcontract agreements for the Project.

13. The internal review process for DHO subcontracts on the Project requires review and approval from several individuals involved in the oversight and management of the Project.

14. After receiving and reviewing the draft purchase order form from DHO, LAD made revisions to the draft terms and transmitted a revised draft purchase order form back to DHO on November 2, 2023.

15. Among the revisions to the draft purchase order form requested by LAD in November 2023, LAD requested to remove all of the flowdown provisions of the Federal Acquisition Regulation ("FAR") contained in the draft purchase order form transmitted in October 2023.

16. Shortly after receiving LAD's proposed revisions to the draft purchase order form in November 2023, DHO decided to end discussions with LAD concerning potential work on the Project.

17. At no time did I believe that DHO and LAD had a binding agreement.

18. I did not direct LAD to perform any work for the benefit of the Project.

19. I did not issue any payment to LAD in connection with the Project, and I am not aware of any payment being issued to LAD.

20. DHO entered into an agreement with Gunderson Marine & Iron to perform the floating dry dock scope of work, involving the marine transport of the prefabricated concrete units forming the dry dock floor.

21. DHO entered into a separate agreement with Mammoet for the heavy transport scope of work, involving the land transport of the prefabricated concrete units, prior to being loaded on the floating dry dock.[153]

---

[153] *Id.* at pp. 26–27.

LAD, in turn, argues that not only does the Second Purchase Order constitute a valid contract under Louisiana law, but the parties' subsequent conduct also gives rise to a contract under Louisiana law.[154] LAD submits an affidavit in support of its position. Lee Dragna, LAD's owner and president, attests as follows:

1. I, Lee Dragna, hereby affirm that I have personal knowledge of the current dispute between Dragados/Hawaiian Dredging/Orion, Joint Venture (DHO) and LAD Services of Louisiana, LLC (LAD). I have personal knowledge of the allegations set forth in LAD' s Second Amended Complaint and all those allegations are true and correct. I have personal knowledge of the allegations set out in DHO's Motion to Dismiss and contents of Dwain Sanders' s ("Sanders") Declaration in Support. I have personal knowledge of the facts set forth in LAD's Opposition Memorandum, and the facts stated therein are true and correct.

2. I affirm that I am over eighteen years of age and I am competent to testify.

3. I am the owner and president of LAD.

4. I personally handled negotiations and discussions between DHO and LAD.

5. After prior phone conversations with Sanders in early February 2023, on February 13 Sanders began sending emails directly to me to assist DHO in securing a 2.8 billion dollar contract with the United States Navy to replace Dry Dock #3 with Dry Dock #5 at the Navafc Joint Base in Pearl Harbor, Hawaii ("the project"). Over the next ten months from February through December of 2023, DHO and LAD exchanged over 5 dozen emails, directed by DHO to LAD; as well as, numerous phone calls and team meetings between them.

6. DHO asked me for recommendations on how to construct and deliver multiple four thousand ton sections of pre-cast concrete units to enlarge the floor of Dry Dock 5, to allow work to be done on the Navy's larger Virginia-Class submarines.

7. DHO "in-house engineers" had proposed use of a converted deck barge on which the concrete units would be constructed and

---

[154] R. Doc. 60.

29

transported on. However, after consulting with me DHO realized that the use of a converted deck barge was not a viable option.

8. I suggested that the flooring units be built on land and then transported by a dry dock, also known as a semi-submersible, for launching and transporting. DHO agreed with my dry dock recommendation and is in fact using the concept I suggested of building the floor units on land and using a dry dock to transport them.

9. I also suggested the use of self propelled modular transporters (SPMTs) for lifting and moving the concrete sections. DHO agreed with my suggestion and is presently using SPMTs for the project.

10. After agreeing to my concept and dry dock suggestion, Sanders directed that LAD design the dry dock. We did the preliminary design, and had Nautical Design and Consulting Engineers (Nautical) do the step by step calculations and modeling for the dry dock. DHO agreed to pay for Nautical Design's third party engineering, and asked that LAD send a (P.O.), DHO could pay for Nautical Design's engineering. Dwain Sanders asked that LAD change the name and direct the purchase order (P.0.) to DHO. Despite demand DHO has failed to reimburse LAD.

11. After we discovered that DHO had miscalculated the weight requirements DHO again directed that LAD do the redesign.

12. By that time I became concerned because LAD had invested substantial resources and incurred significant expense on the DHO dry dock project, and LAD was being asked to invest further resources and incur additional engineering and other expenses. In a phone conversation in early May[] 2023, I expressed those concerns to Sanders who assured me that LAD was going to build the dry dock for DHO. Rachael Smith LAD's Controller and Joey Crappell LAD's manager were present during this phone conversation.

13. After being directed to do so LAD did the redesign, and had Nautical recalculate and model the new design.

14. After approving the redesign DHO requested a quote and a payment schedule from LAD, and we submitted both, immediately.

15. By early October, 2023 LAD's new dry dock design had been accepted by DHO and the dry dock design criteria were approved by ABS.

LAD had submitted a quote and a payment schedule. LAD and DHO had agreed on a price. Based on the terms that had been agreed upon. DHO prepared and sent a purchase order ("P.O.") to LAD on or about October 11, 2023.

16. DHO's P.O. reduced to writing what I understood the agreement was between LAD and DHO. At no time was I advised by anyone from DHO that the agreement would only become effective when signed by the parties.

17. DHO's P.O. provided that for liability purposes, the dry dock was to be owned by LAD throughout the project, with DHO having the option to purchase at the end.

18. DHO's P.O. provided that the dry dock was to be constructed in LAD's shipyard in Amelia, Louisiana.

19. DHO's P.O. provided that the sea trial of the deck barge was to be in Amelia, Louisiana.

20. DHO's P.O. provided that Louisiana workers would deliver the dry dock to Hawaii.

21. DHO's P.O. provided that Louisiana workers would set up the dry dock in Hawaii.

22. DHO's P.O. provided that Louisiana workers would return the dry dock to Amelia, Louisiana once the project was completed.

23. DHO's P.O. directed LAD to secure a bond in the amount of $14,000,000. LAD was approved for thatt [sic] bond through a Louisiana company out of New Orleans.

24. Because LAD understood the time constraints of DHO's project, LAD had made arrangements, in advance for passage through the Panama Canal.

25. Because LAD understood the time constraints of DHO's project LAD worked diligently and expeditiously to do everything DHO directed LAD to do.

26. Even though LAD followed each and every direction given by DHO, DHO in terminated the agreement, with the only explanation given was "we can't come to terms" in early December, 2023.

27. I am personally aware of the fact that the concrete floor units are being built on the Waipo Peninsula and transported by a dry dock.

28. DHO is using a dry dock on the project, but not the dry dock LAD was supposed to build for DHO.

29. I am personally aware of the fact that DHO is using SPMTs on the project, like I suggested.

30. I am personally aware that DHO through Dwain Sanders reached out to Babin Marine, Services to assist DHO in securing the services of Louisiana companies for marine design, construction and transportation.

31. Crosby Marine Services, a Louisiana company is doing shipwork at the Pearl Harbor dock.

32. Trade Winds Towing of Morgan City Louisiana provided the tug boats that towed the barges from Louisiana to Hawaii.

33. McDonough Marine Services a company from New Orleans, Louisiana owned the barges used to transport materials from Louisiana to Hawaii.

34. I am personally aware of the fact that JD Fields was the steel supplier for the project. Most of the materials for the project were loaded at JD Fields' yard in New Orleans.

35. I am personally aware that the barges used to transport materials from Louisiana to Hawaii were fleeted at LAD's yard in Amelia.

36. I am personally aware that the barges were outfitted to travel through the Panama Canal by LAD in Amelia.

37. I am personally aware of the fact that when the barges returned to Louisiana from Hawaii most were demobilized by LAD, and some demobilized by A&M Dockside Repair, Inc. in Morgan City.

38. I am personally aware that some of the barges being used on the project were built by LAD.

39. The barge Marmac 262 which I observed in my aerial flight over Pearl Harbor on October 14th was from LAD's fleet in Amelia. The dry dock

32

vessel *"Pisha",* which I observed in my aerial flight over Pearl Harbor on October 14th appeared strikingly similar to the design LAD had done for DHO.

40. The Gunderson and Mammoet design documents produced by DHO confirm that DHO is constructing floor units on land, and transporting them by a dry dock vessel built by Gunderson and named *"Pisha*[.]*"*

41. The Gunderson design documents for the vessel "*Pisha*" are very similar to LAD's design.

42. I truly believe that DHO used my concept and suggestions to help DHO secure the Navy's 2.1 billion contract for the project. In addition, DHO is using my concept and recommendations to complete the project.

43. Most of the damages suffered by LAD and claimed in this matter occurred in Louisiana including but not limited to the loss of profit from the agreement to construct the dry dock for DHO; direct losses to LAD for un-reimbursed expenses and lost employee time; damages arising from DHO's bad faith business practice and misappropriation of LAD's design.[155]

Under Louisiana law, formation of a valid contract requires four elements: "(1) the parties must have the capacity to contract; (2) the parties must freely give their mutual consent to the contract; (3) the parties must have a cause or reason for obligating themselves; and (4) the contract must have a lawful purpose."[156]

Here, the parties primarily dispute consent. Louisiana Civil Code art. 1947 ("Art. 1947") provides that "[w]hen, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form."[157] Indeed, the Louisiana Supreme Court

---

[155] R. Doc. 85-1 at pp. 1–7.

[156] *Ingraffia v. NME Hospitals, Inc.*, 943 F.2d 561, 565 (5th Cir. 1991) (citing LA. CIV. CODE arts. 1918, 1927, 1966, 1971, & 2029 cmt. b (West 1991)).

[157] LA. CIV. CODE art. 1947.

has explained that "[i]t is elementary in our law, that where the negotiations contemplate and provide that there shall be a contract in writing, neither party is bound until the writing is perfected and signed."[158]

The discussions between LAD and DHO contemplated that the parties did not anticipate to be bound until a written contract was executed. The parties had roughly nine months of occasional communications before DHO transmitted the First Purchase Order to LAD in October 2023.[159] During these negotiations, the parties discussed the various specifications of the anticipated work and various terms and conditions.[160]  On October 3, 2023, LAD, upon request of DHO, sent a payment schedule to DHO that categorized expenses and the percentage of liability for the costs pertaining to the anticipated project.[161] LAD titled its own payment schedule as "LAD *Proposal* of Payment Schedule."[162] Further, LAD titled the first category of payments as "Signing Agreement – to order materials and begin construction[.]"[163] Thus, as demonstrated by LAD's own proposal, LAD contemplated that some sort of signed agreement would be finalized "to order materials and begin construction."[164]

Similarly, on October 11, 2023, DHO transmitted the First Purchase Order to LAD via email, stating "[p]lease see attached *Draft* of Purchase Order for your review. We can set up a video call to discuss if needed. Let me know."[165] By its very language,

---

[158] *Breaux Bros. Const. Co. v. Associated Contractors*, 77 So. 2d 17, 20 (La. 1954)(citation modified).
[159] *See* R. Doc. 85 at pp. 5–9.
[160] *See id.*
[161] *See id.* at p. 9.
[162] R. Doc. 62-1 at p. 64 (emphasis added).
[163] *Id.*
[164] *Id.*
[165] R. Doc. 62-1 at p. 2 (emphasis added).

DHO conveyed to LAD that the First Purchase Order was a starting point for a finalized agreement between the two parties regardless of any terms and conditions listed in the First Purchase Order. Further, the First Purchase Order was not signed and was replete with the phrase "TBD" in key aspects of the document.[166]

Crucially, LAD transmitted a significantly revised Second Purchase Order back to DHO on November 2, 2023 via email, in which LAD's Smith stated "[p]lease see attached *draft* of Purchase Order for your review."[167] The record reflects that LAD itself believed that the Second Purchase Order, of which it now relies upon to assert that there was contract between the two parties, was a draft.[168] A further examination of the record confirms as much.

The Second Purchase Order contained substantial revisions compared to the First Purchase Order. First, LAD changed the term "Seller" in the First Purchase Order to "Supplier" in the Second Purchase Order.[169] The remaining provisions of the Second Purchase Order, however, still contained the term "Seller[.]"[170] Such inconsistent provisions in the Second Purchase Order suggest that the Second Purchase Order was a working draft of the parties' negotiations at the time. Additionally, the Second Purchase Order eliminated roughly 40 pages of Federal Acquisition Regulations ("FAR") that were included in the First Purchase Order.[171] DHO submits that the FAR provisions "are not boilerplate terms, and DHO could

---

[166] *See* R. Doc. 62-1.
[167] R. Doc. 54-1 at p. 2 (emphasis added). It was this Second Purchase Order that was discovered by DHO during these proceedings and was the subject of its Motion for Leave. *See* R. Doc. 54.
[168] *See* R. Doc. 54-1.
[169] *See* R. Doc. 62-4 at p. 2.
[170] *See, e.g., id.* at p. 3.
[171] *See* R. Doc. 62-4 at pp. 23–64.

not agree to strike all of the FAR provisions."[172] These revisions of the First Purchase Order do not suggest that the parties had reached a "meeting of the minds." In sum, the Court finds the following excerpt from the Louisiana Supreme Court to be particularly instructive in the instant matter:

> Since the parties in the instant case intended from the beginning to reduce their negotiations to a written contract, neither the plaintiff nor the defendant was bound until the contract was reduced to writing and signed by them. Therefore, even if all of the terms of the alleged contract between plaintiff and defendant had been verbally agreed upon, no valid contract would have existed between the parties . . . .[173]

Both Plaintiff LAD and Defendant DHO clearly conveyed that both the First Purchase Order and Second Purchase Order were drafts and not finalized, written agreements. Based on the record evidence, the Court finds that LAD and DHO did not reach a finalized agreement via the Second Purchase Order and thus there was no "meeting of the minds."[174]

Additionally, DHO submits that Manuel Morejon, a Construction Manager at DHO, did not have the authority to unilaterally enter into a contract with LAD. According to DHO:

---

[172] R. Doc. 62 at p. 8.

[173] *CAM Logistics, L.L.C. v. Pratt Industries, Incorporated*, 148 F.4th 346, 353 (5th Cir. 2025)(quoting *Breaux Bros. Const. Co.*, 77 So. 2d at 20).

[174] Insofar as LAD argues that the presumption imposed by Art. 1947 has been rebutted by the parties' subsequent performance, the Fifth Circuit has not explicitly addressed such issue. *See CAM Logistics, L.L.C.*, 148 F.4th at 354 ("There is no need for us to decide whether the district court's language stretches far enough to comprise a ruling that the article 1947 presumption can *never* be rebutted by performance.")(emphasis original). Courts within the Fifth Circuit are split on whether subsequent performance can rebut the presumption imposed by Art. 1947. *Compare Sealevel Const., Inc. v. Westcoast Corp.*, Civil Action No. 12–874, 2014 WL 3587264, at *7 (E.D. La. July 18, 2014)(Morgan, J.), *with CAM Logistics, L.L.C. v. Pratt Industries, Inc.*, Case No. 1:20-cv-445, 2024 WL 1216724, at *4 (W.D. La. Mar. 21, 2024), *affirmed by*, *CAM Logistics, L.L.C. v. Pratt Industries, Incorporated*, 148 F.4th 346 (5th Cir. 2025). Nonetheless, even assuming *arguendo* that the Art. 1947's presumption is rebuttable by performance, the Court finds that it was not rebutted in this case for the reasons more fully explained below.

> Any subcontract entered into by DHO for the Project requires review and approvals from various management personnel. Given the significance of the marine dry dock scope of work relative to the overall success of the Project, there was a significant emphasis on this process. Accordingly, various individuals would eventually have the ability to review and approve the process. Mr. Morejon lacked the unilateral authority to create any contract under Louisiana law.[175]

The Fifth Circuit has addressed an analogous scenario in *CAM Logistics, L.L.C. v. Pratt Industries, Incorporated.*[176] In that case, the Fifth Circuit found that Art. 1947's presumption applied where one party contemplated that "any agreement with a fixed term would need to be in writing, passed through [its] required channels of approval, and executed by both parties before having binding effect."[177]

As a final point, it is of no moment that "under Louisiana law, where one party drafts a contract and presents it to the offeree for signing, the contract is valid and binding upon the offeree's acceptance even if the offeror subsequently fails or refuses to sign the document."[178] DHO did not present the First Purchase Order for signing to LAD. Again, DHO reiterated that the First Purchase Order was a "draft" when it transmitted the First Purchase Order to LAD via email.  Further, LAD (i.e., the presumptive offeree) did not sign the First Purchase Order. Second, even assuming *arguendo* that the First Purchase Order constituted an "offer," La. Civ. Code art. 1943 provides that "[a]n acceptance not in accordance with the terms of the offer is deemed

---

[175] R. Doc. 62 at p. 7 (citation modified).

[176] 148 F.4th 346 (5th Cir. 2025).

[177] *Id.* at 354.

[178] *Atl. Banana Co. v. Standard Fruit & S. S. Co.*, 493 F.2d 555, 559 (5th Cir. 1974); *Ludwig v. Bottomly & Assocs., Inc.*, Civ. A. No. 95-3830, 1996 WL 426678, *2 (E.D. La. July 26, 1996) (citing *Atl. Banana*, 493 F.2d at 559).  *See, Pilkington N. Am., Inc. v. Smith,* Civ. A. No. 11–00176, 2014 WL 1248073, at *3 (M.D. La. Mar. 25, 2014) (citing *Atl. Banana* and *Ludwig* and concluding that, "Under Louisiana law, the absence of the offeror's signature on a contract is not enough to render the contract unenforceable[]").

to be a counteroffer."[179] LAD, by not signing the First Purchase Order and instead sending DHO the Second Purchase Order, made a counteroffer to DHO.[180] As noted above, the Second Purchase Order changed a plethora of terms of conditions listed in the First Purchase Order, including but not limited to roughly 40 pages of FAR provisions.[181] Accordingly, the Court finds that no contract was formed between DHO and LAD.

> 2. *Fifth Circuit caselaw supports dismissal for lack of specific personal jurisdiction.*

Beyond the absence of a contract, DHO has minimal contacts with Louisiana. As a general matter, "[a]n exchange of communications in the course of developing and carrying out a contract also does not, by itself, constitute the required purposeful availment of the benefits and protections of [Louisiana] law."[182] Indeed, the Fifth Circuit has explained that:

> [It] has repeatedly held that the combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant.[183]

---

[179] LA. CIV. CODE art. 1943.

[180] *See id.*; *see also Rodrigue v. Gebhardt*, 416 So. 2d 160, 161 (La. Ct. App. 4th Cir. 1982)("For a contract to be formed, the acceptance must be in all things conformable to the offer. An offer must be accepted as made to constitute a contract.").

[181] *See* R. Doc. 62-4 at pp. 23–64.

[182] *Renoir v. Hantman's Associates, Inc.*, 230 Fed. Appx. 357, 360 (5th Cir. 2007)(citing *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 778 (5th Cir. 1986)).

[183] *Freudensprung v. Offshore Technical Services, Inc.*, 379 F.3d 327, 344 (5th Cir. 2004)(citing *Holt Oil & Gas Corp.*, 801 F.2d at 778; *Stuart v. Spademan*, 772 F.2d 1185, 1192–94 (5th Cir. 1985)).

DHO has no offices in Louisiana, nor have any of DHO's employees traveled to Louisiana.[184] The roughly ten months of preliminary negotiations, including the transmittal and exchange of the First Purchase Order and Second Purchase Order, took place electronically and sporadically. Nor is there any evidence that DHO manufactures any products that end up in Louisiana, and there is no evidence that DHO advertises in Louisiana. The Court's detailed Factual Background herein was intentional—and taken from Plaintiff's Fourth Amended Complaint.[185] Plaintiff's Complaint describes, in detail, the communications between the parties, all of which Plaintiff advises were by email or telephone.[186] The emails themselves, provided by Plaintiff as exhibits to Defendant's original Motion to Dismiss, encompass 27 pages, with all but one of the emails consisting of less than five sentences.[187] While the duration of the communications between the parties spanned over the course of months, the substance of the communications, as provided by Plaintiff, was not extensive. There is no evidence of any site visit by DHO, or any visit to Louisiana. Based on Fifth Circuit precedent, the Court finds that these sporadic, preliminary negotiations are insufficient to establish LAD's purposeful availment to Louisiana.

Additionally, DHO has rebutted LAD's key conclusory allegations for which it relies upon for establishing specific personal jurisdiction.[188] First, to the extent LAD asserts that DHO directed it to conduct work under the Second Purchase Order, LAD

---

[184] R. Doc. 83-1 at pp. 23–28.
[185] *See* R.Doc. 80.
[186] *Id.*
[187] *See* R. Doc. 32-1, 10 pages, and R. Doc. 32-2, 17 pages.
[188] *See Sealed Appellant 1 v. Sealed Appellee 1*, 625 Fed. Appx. at 631 ("In evaluating whether the plaintiffs have presented a prima facie case of personal jurisdiction, we will not 'credit conclusory allegations, even if uncontroverted.'" (citation modified)).

provides no record evidence for its assertion.[189] Instead, DHO submits that it has never directed LAD to perform any work or services that were used on the Dry Dock No. 3 project.[190]  Second, LAD contends that "Mr. Sanders assured Mr. Dragna that LAD had the job, and told him 'don't worry, you're our guy and you're going to do this job.'"[191] The record has no evidence demonstrating that such a statement was made by Sanders. In fact, Sanders attests that he did not guarantee that LAD would be selected for any subcontract pertaining to Dry Dock No. 3.[192]

Third, LAD maintains that Crosby Marine Services, Trade Winds Towing, and McDonough Marine Services, all Louisiana companies, are conducting work at the Dry Dock No. 3 site.[193] LAD, however, has provided zero evidence to corroborate its assertion. DHO responds that it never entered into any contractual agreement with Crosby Marine Services, Trade Winds Towing, or McDonough Marine Services.[194] Lastly, insofar as LAD asserts that the Second Purchase Order directed LAD to immediately obtain a $14,000,000 bond, the Court finds that DHO has refuted such claim.[195] The Second Purchase Order provides:

> Purchaser may, at Purchaser's sole discretion and expense, require that Seller obtain and furnish a surety bond guaranteeing full performance of this Purchase Order and that Seller will promptly and fully pay for all work, labor and materials and other charges or costs in connection with the Products ("Bond"). The form of the Bond, the amount of the

---

[189] *See* R. Doc. 85.

[190] R. Doc. 83-1 at p. 24.

[191] R. Doc. 80 at p. 7.

[192] R. Doc. 83-1 at p. 24. Even if taken at its word, the statement is nothing more than an expression of hope of future work.

[193] R. Doc. 85-1 at pp. 5–6.

[194] *Id.*

[195] R. Doc. 85-1 at p. 5.

Bond, and surety underwriting the Bond shall be acceptable to Purchaser in its sole discretion.[196]

Schedule One to the Second Purchase Order also provides that "Seller shall furnish a surety bond as required by the Purchase Order. Bond rate is [TBD]% and will be paid by Purchaser as a direct pass-through cost. Said bond cost is not included in the above-referenced Price."[197] The plain language of the Second Purchase Order indicates that whether LAD is required to purchase a bond is at the sole discretion of DHO. DHO asserts that it never directed LAD to commence any work under the Second Purchase Order.[198] Without any uncontroverted evidence that DHO directed LAD to specifically obtain a bond, the Court finds that DHO has refuted LAD's assertion that the Second Purchase Order required LAD to obtain a bond. It did not. Instead, it was within DHO's sole discretion as to whether to require LAD to purchase a bond, and LAD has not provided any record evidence illustrating DHO required it to obtain a bond. Further, and importantly, the Court again reiterates that it was LAD who provided the Second Purchase Order as a *draft* to DHO. It flies in the face of reason that Plaintiff can provide a draft of an agreement to Defendant, then proceed with fulfilling some of the conditions in that *draft*, and contend that the defendant directed the work through the *draft* Purchase Order.

At its most basic level, personal jurisdiction in this matter hinges on intermittent communications over a ten month period of preliminary negotiations.[199]

---

[196] R. Doc. 62-4 at p. 8.

[197] *Id.* at p. 9.

[198] *See* R. Doc. 83-1 at pp. 23–28.

[199] Relying on Plaintiff's Fourth Amended Complaint, the Court highlights the intermittent communications between the parties, seemingly including months without any communications between the parties. For reasons unknown, the Fourth Amended Complaint fails to include the fact

The Fifth Circuit is clear that "[a]n exchange of communications in the course of developing and carrying out a contract also does not, by itself, constitute the required purposeful availment of the benefits and protections of [Louisiana] law."[200] Accordingly, the Court finds that it does not have specific personal jurisdiction of DHO in this matter.

The Court's analysis, however, does not end at this juncture. "Upon determining that it lacks personal jurisdiction over a foreign defendant, the Court's first option is to dismiss the foreign defendant without prejudice . . . . Alternatively, the Court may authorize limited jurisdictional discovery . . . ."[201] The Court addresses whether jurisdictional discovery is appropriate below.

## B.    LAD has not carried its burden demonstrating that it is entitled to jurisdictional discovery in this matter.

LAD requests that the Court defer its ruling on DHO's Motion to Dismiss so that LAD may engage in jurisdictional discovery.[202] DHO, in turn, submits that LAD has had ample opportunity to discover jurisdictional facts and therefore deferral is unwarranted.[203] The Court finds that LAD is not entitled to jurisdictional discovery.

"A plaintiff seeking discovery on matters of personal jurisdiction is expected to identify the discovery needed, the facts expected to be obtained thereby, and how such

---

that LAD revised the Purchase Order and, on November 2, 2023, sent DHO a significantly revised Purchase Order, advising "Please see attached *draft* of Purchase Order for your review." *See* R. Doc. 54-1 at p. 2 (emphasis added).

[200] *Renoir v. Hantman's Associates, Inc.*, 230 Fed. Appx. 357, 360 (5th Cir. 2007)(citing *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 778 (5th Cir. 1986)).

[201] *Homespire Mortgage Corporation v. Gold Star Mortgage Financial Group, Corporation*, Civil Action No. 21-00306-BAJ-SDJ, 2022 WL 879499, at *3 (M.D. La. Mar. 23, 2022).

[202] R. Doc. 84.

[203] R. Doc. 87.

information would support personal jurisdiction."[204] Thus, "[a] court is entitled to deny leave to conduct discovery where the movant fails to specify what facts it believes discovery would uncover and how those facts would support personal jurisdiction."[205]

Here, although LAD identifies the type of discovery needed (i.e., depositions), it fails to set forth the facts expected to be obtained and how such information supports the finding of personal jurisdiction.  Instead, LAD provides as follows:

> LAD has identified specific, concrete deposition topics directly relevant to the jurisdictional analysis: (1) DHO's decisions about engaging Louisiana contractors and vendors for the Pearl Harbor project; (2) the nature and extent of DHO's communications with Louisiana-based entities; (3) how DHO obtained and used LAD's Louisiana-developed designs; (4) the work performed by Louisiana companies on the Pearl Harbor project; and (5) whether DHO purposefully directed its activities toward Louisiana. These are not vague or speculative inquiries-they go to the core of the minimum contacts analysis.
>
> Legally, DHO's assertion that documents alone suffice to develop the jurisdictional record ignores the fundamental purpose of depositions. Documents may establish *that* certain contacts occurred, but depositions are essential to understand *why* those contacts occurred, *how* decisions were made, and whether DHO *purposefully* directed its activities toward Louisiana-the precise inquiry required under the Due Process Clause. Jurisdictional analysis under the specific jurisdiction framework necessarily requires inquiry into the defendant's knowledge, intent, and decision-making processes, all of which are matters uniquely suited to witness testimony.
>
> Moreover, the Rule 30(b)(6) corporate representative deposition that LAD has sought would require DHO to designate a witness prepared to testify about DHO's organizational knowledge regarding its Louisiana contacts. DHO's refusal to provide such a deponent prevents LAD from

---

[204] *Mello Hielo Ice, Ltd. v. Ice Cold Vending LLC*, No. 4:11–CV–629–A, 2012 WL 104980, at *7 (N.D. Tex. Jan. 11, 2012)(citing *Kelly v. Syria Shell Petroleum Development B.V.*, 213 F.3d 841, 855 (5th Cir. 2000)).

[205] *Evergreen Media Holdings, LLC v. Safran Co.*, 68 F.Supp.3d 664, 672 (S.D. Tex. 2014)(citing *Mello Hielo Ice, Ltd.*, 2012 WL 104980, at *7; *King v. Hawgwild Air, LLC,* No. 3:08–cv–153–L, 2008 WL 2620099, at *8 (N.D. Tex. June 17, 2008)).

obtaining DHO's official corporate position on key jurisdictional facts. If DHO's position is that no such Louisiana contacts exist, it should have no difficulty presenting a corporate representative to say so. Its refusal to do so speaks volumes.[206]

As illustrated above, LAD fails to identify any *specific facts* that would prove the existence of specific personal jurisdiction in Louisiana. Instead, LAD seeks jurisdictional discovery based on generalized assertions pertaining to DHO's possible contacts with other entities located in Louisiana. The Fifth Circuit has rejected this approach in requesting jurisdictional discovery, in which the Fifth Circuit has explained that:

> To merit jurisdictional discovery, [a plaintiff] must show that it is likely to produce the facts needed to withstand dismissal. He must make clear which specific facts he expects discovery to find. We will not authorize a jurisdictional fishing expedition based on a plaintiff's general averments that more discovery will prove our jurisdiction.[207]

LAD's request presents the precise scenario cautioned against by the Fifth Circuit. LAD merely lists generalized "topics" of discussion at anticipated depositions without naming any specific facts that it seeks to establish.[208] LAD's generalized averments, such as the "nature and extent of DHO's communications with Louisiana-based entites[,]"[209] without more, present "a jurisdictional fishing expedition" of which the Fifth Circuit has denounced.[210] Ultimately, "[i]nstead of identifying how [this information] would specifically establish [DHO's] contacts with [Louisiana], [LAD] requested a broad array of information related to [DHO's] businesses, with vague

---

[206] R. Doc. 91 at pp. 4–5 (emphasis original).
[207] *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 326 (5th Cir. 2021)(citation modified).
[208] R. Doc. 91 at pp. 4–5.
[209] *Id.* at p. 4.
[210] *Johnson*, 21 F.4th at 326.

assertions of hope that it would lead to the discovery of unspecified facts that 'would likely' establish personal jurisdiction."[211]

As a final point, LAD filed its initial complaint in this Court on October 10, 2024[212] and filed the instant Motion to Defer on February 11, 2026.[213] LAD has engaged in extensive motion practice regarding discovery disputes before the assigned Magistrate Judge.[214] Moreover, this Court has held a hearing[215] on the issue of personal jurisdiction and has allowed both parties to submit supplemental briefing after the discovery of the existence of the Second Purchase Order.[216] In short, the Court finds that LAD has had ample opportunity – roughly one year – to conduct discovery and unearth facts that could establish personal jurisdiction. The Court therefore denies LAD's Motion to Defer.

### C.   Transfer to the District of Hawaii is required pursuant to 28 U.S.C. § 1631.

Having found that DHO is not subject to specific personal jurisdiction in this Court and that LAD is not entitled to jurisdictional discovery, the Court analyzes whether 28 U.S.C. § 1631 requires that this matter be transferred to the District of Hawaii.

In pertinent part, § 1631 provides that "[w]henever . . . there is a want of jurisdiction, the court *shall*, if it is in the interest of justice, transfer such action or appeal to any other such court ... in which the action or appeal could have been

---

[211] *Pace v. Cirrus Design Corporation*, 93 F.4th 879, 903 (5th Cir. 2024).
[212] R. Doc. 1.
[213] R. Doc. 84.
[214] *See, e.g.,* R. Docs. 47, 48, 76, 79.
[215] *See* R. Doc. 41.
[216] *See* R. Doc. 57.

brought[.]"[217] The Fifth Circuit has explained that § 1631 "use[s] the mandatory 'shall . . . transfer' language, indicating that [it] . . . establish[es] a mandatory duty for a court to transfer a case when [its] respective requirements are met."[218] To that end, a court may transfer a case under § 1631 when the following elements are satisfied "(1) the transferee court would have been able to exercise its jurisdiction on the date the action was misfiled; (2) the transferor court lacks jurisdiction; and (3) the transfer serves the interest of justice."[219]

As to the first element, LAD does not appear to dispute DHO's assertion that this matter could have been brought in Hawaii.[220] Additionally, DHO is a general partnership that is organized in the State of Hawaii, has its physical offices located in Hawaii, and conducts business in Hawaii. Thus, the District Court of Hawaii would have had general personal jurisdiction over DHO on the date this action was misfiled in this Court. Regarding the second element, the Court has previously established that it lacks specific personal jurisdiction in this Court.

Pertaining to the third element, the interests of justice favor transfer, as opposed to dismissal, of this action to the District of Hawaii under § 1631. "[F]ederal courts long have recognized that the principle of comity requires federal courts . . . to exercise care to avoid interference with each other's affairs."[221] Indeed, "[a]s between federal district courts . . . the general principle is to avoid duplicative litigation. The

---

[217] 28 U.S.C. § 1631 (emphasis added).
[218] *Franco*, 3 F.4th at 796.
[219] *Donelon*, 2021 WL 796145, at *8 (quoting *Harutyunyan v. Love*, 2019 WL 5551901, at *4).
[220] *See* R. Doc. 85. Nowhere in LAD's opposition does it mention that suit could not have been originally brought in Hawaii.
[221] *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24, South Atlantic and Gulf Coast District of the ILA*, 751 F.2d 721, 728 (5th Cir. 1985).

concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."[222] Here, dismissing LAD's action *in toto* would not prevent further litigation, as such dismissal for lack of jurisdiction would be without prejudice. Moreover, dismissal could raise issues regarding prescription (i.e., statute of limitations).[223]

The Court has "broad discretion in deciding whether to order a transfer."[224] Exercising such discretion, the Court finds that the interests of justice favor transfer of this matter to the District of Hawaii, as transfer will conserve judicial resources and prevent parallel litigation. Indeed, "[w]hen, as in this case, there is both a lack of jurisdiction and a lack of proper venue and the interests of justice weigh in favor of transfer rather than dismissal . . . a district court can—indeed, must—satisfy its obligations under both [§ 1406(a) and § 1631] through a single use of the transfer power."[225] The Court does so here.[226]

---

[222] *Id.* at 728–29 (citation modified).

[223] *See generally Franco*, 3 F.4th at 797.

[224] *In re Volkswagen of America, Inc.*, 545 F.3d 304, 311 (5th Cir. 2008)(citation modified).

[225] *Franco*, 3 F.4th at 796.

[226] Even assuming *arguendo* that the Court has personal jurisdiction over DHO, the Court would still decide to transfer this matter to the District of Hawaii pursuant to 28 U.S.C. § 1404(a). Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." A court considering a § 1404(a) motion to transfer must determine whether there is an adequate alternative forum and, if so, decide which forum is best-suited to the litigation by considering a variety of private and public interest factors, giving "some weight to the plaintiffs' choice of forum." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court For Western Dist. of Texas*, 571 U.S. 49, 62 n.6 (2013)(citing *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955)). The private interest factors include: (1) the relative ease of access to sources of proof; (2) availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 n.6 (1981)). The public interest factors are: (1) the administrative difficulties caused by court congestion; (2) the local interest in adjudicating local disputes; (3) the familiarity of

## IV.   CONCLUSION

**IT IS HEREBY ORDERED** that the Motion to Dismiss for Lack of Jurisdiction or, in the Alternative, Motion to Transfer Venue[227] is **GRANTED.**

**IT IS FURTHER ORDERED** that Renewed Motion to Defer Ruling on Defendant's Motion to Dismiss Pending Completion of Jurisdiction[228] is **DENIED.**

---

the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws. *In re Clarke,* 94 F.4th 502, 509 (5th Cir. 2024) (quoting *In re TikTok, Inc.*, 85 F.4th 352, 358 (5th Cir. 2023)). A court weighs the relevant factors and decides whether, on balance, a transfer would serve "'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'" *Atl. Marine*, 571 U.S. at 62–63 (quoting 28 U.S.C. § 1404(a)). But the Fifth Circuit has cautioned that no factor is of dispositive weight and that courts must avoid engaging in a "raw counting of the factors that weighs each the same." *In re Chamber of Commerce of United States of America*, 105 F.4th 297, 304 (5th Cir. 2024)(citation modified).  Both parties have briefed their respective arguments as to these factors, and the Court has now considered them based on the record. *See* R. Docs. 83, 85, and 93. Here, as to the private interest factors, the Court finds that the relative ease of access to sources of proof would strongly favor transfer. It is undisputed that the underlying construction project is located at Joint Base Pearl Harbor-Hickam, Hawaii. As Plaintiff has asserted a claim for misappropriation of trade secrets, counsel for Plaintiff advised that an aerial inspection of the Pearl Harbor Naval Base was appropriate to analyze whether DHO is using identical designs to those provided by LAD. *See* R. Doc. 48; R. Doc. 85-1 at p. 6. Further, LAD contends that DHO is using its concepts and designs to complete the Dry Dock No. 3 project. R. Doc. 85-1 at p. 7. Any physical inspection of the Pearl Harbor Naval Base, of course, would take place in Hawaii. In a similar vein, any potential witnesses regarding the past or ongoing construction at the Pearl Harbor Naval Base are currently located in Hawaii. LAD argues that its "documents and witnesses in Louisiana will be at least as extensive as DHO's." R. Doc. 85 at p. 14. LAD attaches an affidavit that reflects that LAD is owned by a single individual, Mr. Dragna, who "personally handled negotiations and discussions between DHO and LAD." R. Doc. 85-1 at p. 2. While LAD argues that its potential witnesses include others contacted by DHO to perform the work, it does not provide any reason that those witnesses could not be available using modern technology, nor does it argue that they are crucial witnesses or are unable to travel if needed. *See* R. Doc. 85. Thus, the Court also finds that the availability of compulsory process to secure the attendance of witnesses and the cost of attendance for willing witnesses both favor transfer. As to the public interest factors, the Court finds that such factors remain neutral, as there are no issues of court congestion, no overriding local interests in resolving this suit as both Hawaii and Louisiana have legitimate interests in providing a forum for this dispute.  Further, neither court would have difficulties in applying the appropriate state law as each court routinely applies another state's law, and there are no issues of conflicts of law. As a final point, the Court acknowledges that the Second Purchase Order contains a forum selection clause. *See* R. Doc. 62-4 at p. 7. Having previously found that the Second Purchase Order is not a valid contract, the Court notes that such forum selection clause bears no weight on its analysis. Ultimately, with three private interest factors favoring transfer, the Court, if personal jurisdiction over DHO existed, would find that the interest of justice requires transfer to the District of Hawaii.

[227] R. Doc. 83.

[228] R. Doc. 84.

**IT IS FURTHER ORDERED** that this matter is **TRANSFERRED** to the United States District Court for the District of Hawaii.

**IT IS FURTHER ORDERED** that this Order and Reasons transferring the matter is **STAYED** for 30 days in order for any appeal to be lodged prior to transfer.[229] If no Notice of Appeal is filed within 30 days of this Order, the matter will be transferred to the District of Hawaii pursuant to this Order.

New Orleans, Louisiana, August 5, 2026.

**WENDY B. VITTER**
**United States Dirct District Judge**

---

[229] *See In re Clarke,* 94 F. 4th 502 (5th Cir. 2024).